**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| **GATEWAY PACKAGING COMPANY, LLC**<br><br>     **Plaintiff,**<br>**vs.**<br><br>**SCHELL & KAMPETER, INC. a/k/a Diamond Pet Foods, MORRIS PACKAGING, LLC, MORRIS CONVERTING, LLC, GREG BELOW, and JOSEPH FIORE,**<br><br>     **Defendants.** | **Case No.**<br><br>**Demand for Jury Trial** |

## COMPLAINT

Plaintiff Gateway Packaging Company, LLC ("Gateway"), by and through its undersigned counsel of record, for its Complaint against Defendants Schell & Kampeter, Inc. a/k/a Diamond Pet Foods, Morris Packaging, LLC, Morris Converting, LLC, Greg Below, and Joseph Fiore states and alleges as follows:

## Introduction

1. This is a Complaint for, *inter alia*, misappropriation of trade secrets, breaches of contract, tortious interference with a business expectancy or relationship, unjust enrichment, civil conspiracy, breaches of contract and other torts stemming from Defendants' wrongful acts which have caused Gateway to suffer millions of dollars in losses.

## Parties

2. Gateway is a Delaware limited liability company, with facilities in Kansas City, Missouri; Granite City, Illinois; and White House, Tennessee. At times relevant to this lawsuit, Gateway also had corporate offices in St. Louis, Missouri.

3.      Defendant Schell & Kampeter, Inc., a/k/a Diamond Pet Foods ("Diamond"), is a Missouri corporation which may be served by its Registered Agent Michael Kampeter, Registered Agent, 103 North Olive, Meta, Missouri.  Diamond's headquarters are also at 103 North Olive, Meta, Missouri.  Meta, Missouri is located in Osage County, Missouri which is within the boundaries of the United States District Court for the Western District of Missouri.

4.      Defendant Morris Packaging, LLC ("Morris Packaging"), is an Illinois limited liability company which may be served through its registered agent James R. Morris, 211 North Williamsburg Drive, Suite A, Bloomington, Illinois  61704-7735.

5.      Defendant Morris Converting, LLC ("Morris Converting") is a Missouri limited liability company which may be served through its registered agent Hallie H. Gibbs II, 3225 Emerald Lane, Suite A, Jefferson City, MO 65109.  Morris Converting is owned by Morris Packaging.  Morris Converting is headquartered in Jefferson City, Missouri where it has its manufacturing plant.  Morris Packaging and Morris Converting are closely related entities and are hereafter collectively referred to as "Morris."

6.      Defendant Greg Below ("Below") is an individual formerly employed by Gateway and, upon further information and belief, is currently employed by Morris.  Mr. Below may be served at 725 Arvi Lane, Antigo, Wisconsin 54409.

7.      Defendant Joseph Fiore ("Fiore") is an individual formerly employed by Gateway and, upon further information and belief, is currently employed by Morris.  Fiore may be served at 105 Hatfield Street, Caldwell, New Jersey 07006.

## Jurisdiction and Venue

8.      Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this matter because it asserts a civil action arising under 18 U.S.C. § 1836(c).

9.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because, as detailed more fully below, the state law claims asserted by Gateway are so related to the federal claim which Gateway has asserted that they form part of the same case or controversy under Article III of the United States Constitution.

10.    This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states.  Additionally, the amount in controversy exceeds $75,000 because, as a result of the actions detailed below, Gateway has suffered damages of at least $9.8 million due to lost sales and lost developmental costs.

11.    This Court has personal jurisdiction over the Defendants because each Defendant is a Missouri resident or has misappropriated a trade secret and/or committed a tort and/or breached a contract in the State of Missouri.

12.    Pursuant to 28 U.S.C. § 1391, venue is appropriate in this Court because a substantial part of the events giving rise to the claims asserted in this Complaint occurred in the Western District of Missouri and because Defendants are subject to personal jurisdiction in this District with respect to this action.

## Facts

### Gateway and its products

13.    Gateway manufactures and sells flexible packaging products such as multi-wall bags, preformed pouches, rollstock lamination, lidding, and labels.

14.    Gateway markets and sells its packaging materials throughout the United States.

15.    Gateway is particularly known for manufacturing specialty bagging in the pet food industry, including hybrid and multi-wall bags.  The bags at issue in this lawsuit were manufactured and shipped from Gateway's Kansas City, Missouri plant.

*Below's contractual obligations to maintain Gateway's trade secrets*

16.     Gateway keeps its business records and trade secrets confidential.

17.     Gateway requires that all of its employees sign non-disclosure agreements that prohibits them disseminating or otherwise using confidential Gateway information including its trade secrets.

18.     On or about August 23, 2012, Below and Gateway signed a written confirmation of Below's employment as a Business Development Manager of Sales at Gateway.

19.     Below's written confirmation of employment contained the following provision by which Below agreed to be bound: "**Confidentiality:** You are expected to conduct yourself in a manner consistent with the Gateway standard of conduct policy, the Gateway IT policy *and the Gateway Confidentiality Agreement*." (emphasis added).

20.     In connection with his new employment, on September 11, 2012, Below signed a Non-Disclosure/Confidentiality Agreement with Gateway.  That agreement provides:

> As an employee of, or a consultant for, Gateway Packaging Company, I hereby covenant and agree that any and all knowledge or information which I may acquire or obtain therein, and particularly any knowledge or information or trade secrets which I may acquire with reference to Gateway's customers, suppliers and personnel, or the manufacturing, purchasing, pricing, costs and sales of any of Gateway's products (brokered or manufactured) *shall and will be held by me in strict confidence and trust. Further, I will not duplicate, discuss, disclose, divulge, reveal or in any way make known any such knowledge and/or trade secret information or any part thereof directly or indirectly to any other person, firm, corporation, or entity; or make any use of the same for myself or any other person, firm, corporation, or entity.*
>
> Due to employee access to proprietary and confidential information, the Company does not allow employees to bring cellular phones with cameras or imaging capabilities into its facilities.  Employees are allowed to bring cell phones to work, but they must be stored in their locker, and they are not allowed on the production floor.
>
> ….

Should I leave the employment of Gateway Packaging Company for any reason, I understand that my obligation arising hereunder shall *continue for a period of two (2) years from the date thereof.*

Non-Disclosure/Confidentiality Agreement (emphasis added).

21.     Below knew that Gateway kept its business information and trade secrets confidential.

22.     In the course of his employment at Gateway, Below worked to obtain non-disclosure agreements with multiple Gateway customers so as to protect Gateway's trade secrets.

***Fiore's contractual obligations to maintain Gateway's trade secrets***

23.     On April 26, 2013, Fiore signed a written confirmation of offer of employment as Vice President of Sales and Marketing for Gateway based in their corporate office in St. Louis, Missouri.

24.     Fiore's written confirmation of employment contained the following provision by which Fiore agreed to be bound: "**Confidentiality:** You are expected to conduct yourself in a manner consistent with the Gateway standard of conduct policy, the Gateway IT policy *and the Gateway Confidentiality Agreement*." (emphasis added)

25.     In connection with his new employment at Gateway Fiore signed a Confidentiality Agreement with Gateway.  Fiore's Confidentiality Agreement provides in relevant part:

1.     *Employee agrees that all information* and know-how, whether or not in writing, of a private, secret or confidential nature *concerning the business or financial affairs of the Company or the Company's affiliates is and shall be the exclusive property of the Company and the Company's affiliates.* Such information and know-how shall include, but not be limited to, trade secrets, ideas, skills, knowledge, improvements, works of authorship, inventions (whether or not patentable), products, processes, methods, techniques, formulas, compositions, projects, developments, plans, research data, financial data, personnel data, technical, business, financial, customer and product development

plans and forecasts, customer pricing and tiered pricing schemes, computer programs, computer codes, algorithms, modules, scripts, features, and modes of operation, designs, technology, internal documentation and employee, customer and supplier lists, contacts at or knowledge of current or prospective customers of the Company or the Company's affiliates, and such other information concerning the Company or the Company's affiliates (collectively, "Proprietary Information"). *Employee shall not disclose*, either during the period of Employee's evaluation of the Company or thereafter, *any Proprietary Information to others outside the Company or the Company's affiliates or use the same for any unauthorized purposes without the prior written approval of the Company*.

2.       *Employee agrees that all* files, letters, memoranda, reports, records, data, sketches, drawings, laboratory notebooks, program listings, computer software, computer discs, tapes, printouts, source, html and other code, flowcharts, schematics, designs, photographs, charts and customer lists, or other written, photographic, or other tangible material, whether printed, typewritten, handwritten, electronically stored on disk, tapes, hard drives or other storage media, containing or embodying Proprietary Information or any other information concerning the business, operation or plans of the Company or the Company's affiliates, whether created by Employee or others, which shall come into Employee's custody, possession or control (collectively, *"Company Materials"), shall be and are the exclusive property of the Company or the Company's affiliates to be used by Employee only for the benefit of the Company or the Company's affiliates*. Employee understands that the Company possesses Company Materials that are important to the Company, the Company's affiliates and the customers and employees of the Company and the Company's affiliates and Employee agrees to deliver to the Company upon termination of the evaluation (or prior thereto if so requested by the Company) all Company Materials in Employee's possession, custody or control.

3.       *Employee agrees that Employee's obligation not to disclose or use information, know-how and records of the types set forth in Sections 1 and 2 hereof, also extends to such types of information, know-how, records and tangible property of customers of the Company or the Company's affiliates or suppliers to the Company or the Company's affiliates or other third parties who may have disclosed or entrusted the same to the Company or the Company's affiliates or to Employee in the course of the Company's business*.

Confidentiality Agreement (emphasis added).

26.       Through his Confidentiality Agreement Fiore explicitly agreed to hold in strict confidence the confidential information and trade secrets he learned while employed at Gateway.

KCP-8347088-2

27. Fiore knew that Gateway kept its business information and trade secrets confidential.

### *Creating an acceptable bag for Costco Wholesale*

28. Diamond manufactures private label dog food under the Kirkland brand for Costco Wholesale Corporation ("Costco"), a nationally known retail business.

29. Diamond does not manufacture the packaging material for the pet food it produces, but rather Diamond purchases the packaging from third parties such as Gateway.

30. Prior to 2013, Diamond was purchasing all (or substantially all) of its flexible packaging materials from Morris. However, Diamond was not happy with Morris' performance given that it relied upon at least one other party to help produce the flexible packaging material.

31. Beginning in April 2013, Below contacted Andy Kampeter ("Kampeter") at Diamond seeking to discuss Gateway's interest in producing product for Diamond.

32. Below persuaded Kampeter to have a call with him on May 2, 2013 and discussed sending Diamond samples.

33. Below knew that in order to send samples to Diamond he needed to get a signed non-disclosure agreement from Diamond to protect Gateway.

34. Early in the morning on May 2, 2013, Below emailed David Antonini (Gateway's Chief Financial Officer at the time) asking for "the NDA you would like us to use for a customer who would like a sample of our woven bag." The customer to whom Below referred was Diamond.

35. A short time later Antonini emailed to Below Gateway's form non-disclosure agreement.

KCP-8347088-2

36.     At approximately 10:45 a.m. on May 2, 2013, Below had a call with Kampeter of Diamond.

37.     During the call Below and Kampeter discussed both the Gateway samples and the Gateway non-disclosure agreement.

38.     Following the call (at approximately 11:17 a.m.), Below took Gateway's form non-disclosure agreement and added "Diamond Pet Foods" as the contracting party.

39.     Below subsequently transmitted the non-disclosure agreement to Diamond.

40.     At 11:25 a.m. on May 2, 2013, Below sent an email to Omar Abuaita ("Abuaita") (Gateway's Chief Executive Officer) with a "cc" to Antonini. Below reported that he had just had a call with Kampeter at Diamond and that Kampeter was very enthused about Gateway's potential offerings.

41.     Below then stated, "Once they sign an NDA we will move forward with samples and testing at Diamond. They are interested in both woven options, paper woven and PE woven. Also Hybrid and quadseal."

42.     Below further stated that Kampeter "heard we hired Joe Fiore and was pleased to hear that. We did not go into detail but obviously Joe has some positive history with Andy."

43.     In addition to his email to Abuaita, Below also internally summarized his call with Kampeter. Specifically, Below stated, "I had a conference call with Andy [Kampeter]…and discussed his current needs and opportunities for Gateway. Also sent him an NDA so he could review our latest samples."

44.     Diamond did not immediately return the signed NDA.

45.     On May 13, 2013 Below sent Kampeter an email stating, "Good morning Andy, Did you get a chance to review/complete the NDA so I can sent out the samples?"

46.     Knowing the importance of obtaining non-disclosure agreements, Below would not have sent samples to Kampeter (Diamond) without first having obtained a signed non-disclosure agreement.

47.     Below communicated to Diamond the importance of a non-disclosure agreement and, upon information and belief, Diamond agreed to keep items from Gateway confidential.

48.     Upon information and belief, Kampeter signed and returned the NDA to Below.

49.     For reasons currently unknown to Gateway and to the best of Gateway's belief and understanding, Below subsequently went through his emails and permanently deleted any reference that he had to a non-disclosure agreement with Diamond.

50.     Upon information and belief, Below intentionally deleted these emails and sought to hide the fact that he had sought an NDA with Diamond.

51.     Sometime during the week of June 17, 2013, Below and Fiore met with Kampeter at Diamond's facility in Meta, Missouri.

52.     During that meeting (and/or as part of the on-going discussions with Diamond), Kampeter asked Gateway to work collaboratively with Diamond to help solve a problem for Diamond's client, Costco.

53.     Specifically, the 40-pound bags that Diamond was supplying to Costco were prone to being punctured or breaking open and spilling pet food onto the floor when customers bumped into the bags with their shopping carts.

54.     Upon information and belief, these bags were supplied by Morris.

55.     This spillage was problematic for Costco as it caused lost profit. Costco had requested that Diamond supply it with bags that would be more puncture resistant, less likely to break open, and more durable such that there would be less lost product. However, Morris did

not have the ability or knowledge to produce such a bag that would be satisfactory to Diamond and Costco.

56.     Gateway and Diamond began working diligently to develop a bag that would be satisfactory to Costco.

57.     Developing the new bag proved to be a difficult, technically challenging, and time consuming process.

58.     Gateway and Diamond knew that the bag needed to be a pinched-bottom, open-mouth ("PBOM") bag.

59.     Gateway and Diamond also knew that the new PBOM bag needed to be a hybrid bag.  A hybrid bag is one where the outer shell is composed of nylon film (material) and the inner lining is paper.  The bag can be labeled through reverse printing (i.e., printing on the nylon film) or regular printing (with the printing being done on the paper liner).

60.     There were other hybrid bags on the market at the time that had a nylon outer shell.  But none of the hybrid PBOM bags were made of 100 gauge ("100 ga") Biaxially Oriented Nylon ("BON") film.

61.     Gateway was initially told that there needed to be a 25% improvement in the strength of the bag as compared to what was currently being sold to Costco.

62.     It was determined that the 100 ga BON film was a very durable product that could satisfy Costco's needs.

63.     But the 100 ga BON film also presented several new technical hurdles that had never been addressed in the pet food packaging industry.

64.     Generally speaking, a hybrid PBOM bag will consist of the outer shell (a nylon film which is adhered to a paper lining) and an inner lining.  A hot melt must be applied to seal

the liner and outer seam of the bag. Once the bag is formed a hot melt must also be used to seal the bottom of the bag, and a hot melt must also be applied to the open mouth top such that it may be heated and sealed once the bag is filled with pet food.

65.    One of the challenges with using 100 ga BON film was getting the right amount of adhesives and cold glues to be used in assembling the bag. Too much adhesive would cause the printing on the film to smear while too little adhesive would not properly hold the bag together. Additionally, too little or too much adhesive and cold glues in the bag will directly impact the bag's strength and performance.

66.    In addition, there were several other aspects of the bag that required development such that the bag would be properly presentable to Costco (and its customers). This development included identifying the proper inner linings of the bag to avoid the dimpling effects of pet food. Furthermore, the right type and amount of hot melt had to be determined that would properly seal the bag and not cause delays or problems in the manufacturing process.

67.    The challenge for Gateway was developing a bag that was robust enough to not only withstand the strains of customer traffic and shopping carts in Costco but also a bag that could be used to package pet food at Diamond's headquarters in Meta, Missouri, as well as its other manufacturing plants located in Gaston, South Carolina; Lathrop, California; and Ripon, California.

68.    There were approximately a total of nine lines between Diamond's four plants on which the 100 ga BON hybrid bag would be run. Each of those four plants had their own idiosyncrasies and unique aspects. The bag had to be created in such a way such that it could be successfully used in all of Diamond's plants and on its nine manufacturing lines.

*Development of Gateway's BON Hybrid PBOM bag*

69.     Gateway's development of the new bag was an arduous, difficult process that took extensive time to complete and was very costly for Gateway.

70.     In 2014, Gateway began earnestly working to develop the 100 ga BON hybrid PBOM bag.

71.     The process consisted of numerous trials with Gateway experimenting with several different iterations of component materials over a span of approximately two years.

72.     By 2015 (and after much internal trial and error), Gateway had finally ascertained the proper adhesive coating weight to be applied to the 100 ga BON film.  This was an important technical milestone in the development of the hybrid PBOM bag

73.     The correct coating weight used for the 100 ga BON film would be extremely difficult to reverse engineer due to the setting and drying that occurs once the adhesive is applied.  It would also be extremely difficult to reverse engineer the various aspects of the adhesive glues, cold glues, and hot melts used in the manufacture of the 100 ga BON hybrid bag (including the type of sealant, the amount of the sealant, the coat weight that was applied, the heating temperature that was used, the application temperature, and the run speed).

74.     Normally, the coating weight information would not have been shared with Below or Fiore.  However, in late 2015 there were some internal emails exchanged at Gateway on which both Below and Fiore were copied wherein the current specifications for the 100 ga BON hybrid bag were attached (including identification of the proper adhesive coating weight to be used for the bag).

75.     The information contained in the attachments was trade secret information of Gateway.  Both Below and Fiore were prohibited by the terms of their non-disclosure

agreements from disseminating this information to unauthorized parties, including parties outside of Gateway.

76.     By 2015, Gateway had determined the appropriate structure for the Costco bag (including using the 100 ga BON film as the outer shell).  Diamond was aware of Gateway's intended use of the 100 ga BON film.

77.     Since 2015, Gateway has had the ability to print in two ways: (1) reverse-printing the BON film and then laminating it to paper, and (2) positive-printing the paper and laminating it to the BON film.  Gateway printed the 100 ga BON film for Diamond in both ways.

78.     Another significant technical challenge that Gateway faced was finding the right hot melt to be used for sealing the 100 ga BON bags.

79.     Not all hot melts are the same.  Rather, each has different physical characteristics which cause different results depending on the type of materials to which they are applied, the temperature at which the hot melt is heated, the amount of hot melt which is applied, and the heat and speed by which it is applied during the manufacturing process.  Identifying the right hot melt and the right manufacturing conditions proved to be very expensive both in terms of time and money spent.

80.     Gateway spent significant time and money working to find the right hot melt and the right manufacturing conditions for producing the 100 ga BON hybrid bag.  This included identifying particular types of hot melts to be used, producing bags with that particular hot melt, and then running those bags in Diamond facilities using different manufacturing conditions to see how they would fare in a packaging environment.

81.     Once Gateway had produced a batch of experimental 100 ga BON hybrid bags, it would then take those bags to a Diamond facility where varying temperatures and manufacturing speeds would be employed to see how well the seal would hold.

82.     Gateway's development of the Costco bag occurred primarily in both Gateway's facility in Kansas City, Missouri and Diamond's facility in Meta, Missouri.

83.     There were also various consultations between Gateway and Diamond personnel at the companies' respective facilities in Kansas City and Meta, Missouri.

84.     This included a collaborative meeting at Gateway's facility in Kansas City, Missouri in April 2016 which was attended by Kampeter and Below, among others.

85.     By approximately August 2016 the new hot melt had shown some signs of success in Gateway's Kansas City plant followed by promising trial runs on a limited basis in Diamond's manufacturing plants.  However, there were still some additional problems with the hot melt as it was still not 100% satisfactory.

86.     In August 2016, additional bags were produced at Gateway's Kansas City plant and then sent to Diamond's plant in Meta, Missouri for additional trial runs.  Based on those trial runs it was determined that a different hot melt should be used.

87.     During this time period Gateway had been in communication with another hot melt supplier with which Gateway had previously entered into a non-disclosure agreement.

88.     The supplier had developed a new hot melt which Gateway believed would work for the 100 ga BON hybrid bags.

89.     Gateway subsequently manufactured new bags in its Kansas City plant using this new hot melt and shipped the bags to Diamond where they were successfully trialed.  Based on this it was determined that Gateway would switch to this new hot melt supplier.

90.     Both Below and Fiore knew who the new hot melt supplier was and the specific type of hot melt being used to successfully produce the Costco bags for Diamond.

91.     On or about October 20, 2016, Below and Kampeter had a face-to-face meeting to discuss current and future business, the strategy for implementing the new hot melt, quality, and a proposed raw material agreement between Gateway and Diamond.

92.     By November 2016 it had become apparent to both Gateway and Diamond that the Costco bag had been successfully developed.  Gateway was now ready to take the business relationship to the next level.

93.     On the morning of November 22, 2016, Below sent an email to Vance Fortenberry of Gateway stating that he (Below) could not find an updated specification sheet to reflect the current materials used for the 100 ga BON hybrid bag for Costco.  Below also asked for the COF range.  Below indicated it would be used as part of a raw material agreement with Diamond.  However, Below did not indicate that he, in fact, intended to share that document with Diamond.  Indeed, it would be atypical for a Gateway employee to share a technical data sheet outside the company, and there was not a legitimate reason to do so in this situation.

94.     Later that day (November 22, 2016), Fortenberry emailed Below with the current, single-page technical data sheet for the Costco bags.  The technical data sheet had a "Confidential" background watermark on it.

95.     Early in the morning on November 23, 2016, Below emailed the technical data sheet to Kampeter.  His email had no text, but rather just the subject line reading "Kirkland bag spec sheet."

96.    One week later, on November 30, 2016, Below again emailed the same technical data sheet to Kampeter.  Below also included in that email a proposed raw materials agreement in Word format and an Excel file with price quotes for smaller 20 and 25-pound bags.

97.    Both Diamond (Kampeter) and Gateway signed the raw materials agreement.  The agreement delineated respective responsibilities with respect to the production of the Costco bag.

98.    Upon information and belief, Diamond knew that the information it received from Gateway regarding the 100 ga BON hybrid PBOM bag was confidential and not to be shared with third parties.

### *Fiore's and Below's sudden departure from Gateway and interference by Morris*

99.    Jim Morris is the principal owner and/or manager of Morris.

100.    Both Below and Fiore have known Jim Morris for years.

101.    Sometime in 2016, Morris approached Fiore with an offer of employment.

102.    Morris is a direct competitor of Gateway with both companies vying to sell packaging material to Diamond.

103.    Upon information and belief, Morris had lost Diamond sales to Gateway, and Morris was looking for a way to make up for the lost sales.

104.    Upon information and belief, Morris sought to employ Fiore given Fiore's knowledge of Gateway's on-going business dealings and its existing customer base (including Diamond).

105.    By approximately November 2016, Fiore and Gateway were having discussions about Fiore's departure.  Upon information and belief, Fiore knew that he would be leaving Gateway to work for Morris.  Upon further information and belief, Fiore knew that his success at Morris would be partly dependent upon getting Below to move to Morris.

106.    In late 2016, Fiore ceased doing any work for Gateway. He also returned his company laptop on or about November 30, 2016, and he returned his company vehicle.

107.    Fiore had substantial information regarding Gateway's trade secrets at the time he left Gateway.

108.    Thereafter Fiore began his employment at Morris as Vice President of Sales and Marketing. This was the same position that Fiore held at Gateway.

109.    While employed at Gateway, Below directly reported to Fiore.

110.    Fiore was well aware of Below's efforts with Diamond developing the 100 ga BON hybrid bag for Costco.

111.    Diamond was Below's largest account while he was employed at Gateway. It was also one of Gateway's larger clients.

112.    Fiore knew that Gateway had recently completed development of the Costco bag and that it has been successfully trialed in the Diamond plants.

113.    Fiore knew that Below had significant contact with Kampeter and that Below had significant knowledge regarding the Costco bag that Gateway had developed.

114.    Upon information and belief, sometime in late 2016 Below was approached with an invitation to leave Gateway to work for Morris.

115.    Upon information and belief, Fiore encouraged Below to leave Gateway and begin working for Morris.

116.    Below subsequently agreed to accept employment with Morris.

117.    Below's last date of employment with Gateway was on or about March 6, 2017.

118.    Below had substantial information regarding Gateway's trade secrets at the time he left Gateway.

119.     When he left Gateway Below began his employment at Morris working in a sales capacity similar to what he did at Gateway.

**_Morris' sale of its 100 ga BON film hybrid bag to Diamond_**

120.     Gateway went through numerous iterations of the 100 ga BON film hybrid bag to finally get an acceptable product that Diamond could use for Costco.

121.     This bag was unique to Gateway and Diamond for the Costco application with no other competitor producing a similar bag.

122.     To the best of its knowledge, Gateway's 100 ga BON hybrid PBOM bag was the only bag of its kind anywhere in the world prior to 2017.

123.     Within weeks of Fiore's and Below's departure from Gateway, Morris began working with Diamond utilizing Gateway's specifications to produce a 100 ga BON hybrid bag to be used for Diamond's sales to Costco.

124.     The development of this bag would have required Fiore and Below (as representatives of Morris) communicating with Diamond and traveling to Diamond's headquarters in Meta, Missouri to develop the bag.

125.     In 2017, Gateway learned that Diamond was using a 100 ga BON hybrid bag for sales to Costco which bags were supplied by another entity.  Gateway further has learned that Morris reverse prints and then laminates the 100 ga BON film at its facility and then ships that roll stock to a third party which, in turn, produces the inner lining of the bag and then ships it to Diamond where the bags are filled with pet food and sold to Costco.

126.     It was not until Fiore and Below started their employment at Morris that Gateway saw this competitor bag being produced for Diamond.

127.     As a practical matter, it would have been impossible for Below and Fiore to have

viably functioned in their respective new jobs at Morris without using the Gateway's trade

secrets and confidential information that they had obtained while employed at Gateway.

128.     Additionally, (1) given the years of work and significant money spent by Gateway

in developing the 100 ga BON hybrid bag for Diamond, and (2) that Diamond had exposure to

Gateway's trade secrets and confidential information, it would have been impossible for a third

party to have so quickly developed a 100 ga BON hybrid bag in conjunction with Diamond

without having obtained knowledge of, and having used, Gateway's trade secrets and

confidential information.

### *Gateway's damages*

129.     Altogether, Gateway spent more than $2 million in developing the 100 ga BON

hybrid bag for Diamond to be used in its sales to Costco.  The $2 million in development costs

included (but was not limited to) start-up expenses, training, scrap, reworking charges, etc.

130.     In 2014, Gateway had approximately $400,000 in annual sales to Diamond.  That

number increased to approximately $4.6 million by 2015.  By 2016 it swelled to approximately

$8 million with the 2016 product being manufactured in Gateway's Kansas City plant.

131.     On January 12, 2018, Diamond notified Gateway that it was ending all orders of

bags from Gateway, effective March 1, 2018.

132.     Gateway estimates that, but for the improper acts of Defendants, Gateway would

have generated approximately $7.8 million in annual sales to Diamond.

**Count I**
**Misappropriation of Trade Secrets**
**18 U.S.C. § 1836 and Uniform Trade Secrets Act**
**(All Defendants)**

133.     Gateway hereby incorporates each of the foregoing paragraphs as if fully set forth herein

134.     Gateway may bring this civil action under 11 U.S.C. § 1836(b) as an owner of the trade secrets that were intended for use in interstate commerce and which were misappropriated.

135.     Additionally, both Tennessee (Tenn. Code § 47-25-1701 *et seq.*) and Missouri (Mo. Stat. § 417.450 *et seq.*) have adopted the Uniform Trade Secrets Act ("UTSA"). Gateway may bring this action under UTSA seeking recovery of the damages it has sustained as a result of Defendants' actions.

136.     As detailed more fully above, Gateway spent significant time and money developing a 100 ga BON hybrid PBOM bag to be sold to Diamond which, in turn, would use that bag in the sale of pet food to Costco.

137.     Gateway's trade secrets regarding the 100 ga BON hybrid PBOM bag include (but are not necessarily limited to) knowing the proper type of adhesive and adhesive weights to be applied to the 100 ga BON hybrid film, the proper type and characteristics of the hot melts needed to be used, and the proper conditions for manufacturing the bag (including, but not necessarily limited to, coat weights, heating temperatures, application temperatures, and run speeds).

138.     Gateway took reasonable steps to protect its trade secrets by requiring all of its employees to sign confidentiality agreements which prohibited disclosure of its confidential and trade secret information. The confidentiality agreements prohibited disclosure of the confidential information even after the employee had terminated his or her employment with the company.

139.    Consistent with its customary business practice, Gateway required a a non-disclosure agreement from Diamond which prohibited it from sharing Gateway's trade secrets and confidential information.

140.    Gateway watermarked its technical data sheet that was sent to Diamond as "Confidential."

141.    Gateway's trade secrets derive independent economic value. Gateway developed its trade secrets through years of labor and significant money invested in developing the 100 ga BON hybrid bag.

142.    The 100 ga BON hybrid bag was a first-of-its kind product that was superior to other hybrid PBOM bags being offered in the marketplace at that time.

143.    The 100 ga BON hybrid bag was the type of bag that Costco desired so that it could significantly reduce punctured and opened bags and thereby minimize/limit loss of product in its stores.

144.    The 100 ga BON hybrid PBOM bags were intended to be and in fact were sold in interstate commerce as they were manufactured and shipped from Gateway's Kansas City, Missouri plant to Diamond's various plants in different states. Diamond, in turn, filled the bags and then sold them to Costco which used them in various locations throughout the United States.

145.    Below knew that he had signed a Confidentiality Agreement with Gateway which prohibited his dissemination of Gateway's trade secrets and confidential information to unauthorized parties, including parties outside the company.

146.    Fiore also knew that he had signed a Confidentiality Agreement with Gateway which prohibited his dissemination of Gateway's trade secrets and confidential information to unauthorized parties, including parties outside the company.

147.     Morris knew (or should have known) that Below and Fiore were under Confidentiality Agreements with Gateway that prohibited them from disclosing or sharing any trade secrets or other confidential information of Gateway.

148.     Diamond knew (or should have known) that Below and Fiore were under Confidentiality Agreements with Gateway that prohibited them from disclosing or sharing any trade secrets or other confidential information of Gateway.

149.     Below and Fiore retained access to, and are using, Gateway's confidential and proprietary information and trade secrets in the course of their employment with Morris.

150.     These trade secrets include (but are not necessarily limited to) confidential and proprietary information regarding how Gateway manufactures the 100 ga BON hybrid PBOM bag which is sold to Costco, Gateway's business dealings with Diamond, and Gateway's business dealings with its other customers.

151.     Within weeks after Below and Fiore began their employment for Morris, Morris began working with Diamond to produce a 100 ga BON film that was used by Diamond for sales to Costco.

152.     Using Gateway's trade secrets and confidential information that Diamond had obtained in the course of its lengthy work with Gateway, Diamond collaborated with Below, Fiore and Morris to produce a 100 ga BON hybrid bag.

153.     Morris could not have produced the 100 ga BON hybrid bag so quickly but for the unauthorized use of Gateway's trade secrets by Morris, Below, Fiore and Diamond.

154.     Morris has continued its efforts to obtain Gateway's trade secrets by seeking to hire one or more Gateway employees with key knowledge regarding the manufacturing of the 100 ga BON hybrid bag.

155. Defendants acted willfully and maliciously in misappropriating Gateway's trade secrets for their own personal gain.

156. As a result of these actions Gateway lost the benefit of the monies and time it had invested in developing the 100 ga BON hybrid bag. These developmental costs were at least $2 million. Gateway also lost at least $7.8 million in annual sales of the bag.

WHEREFORE, Gateway requests that this Court enter judgment in favor of Gateway and against Defendants (a) permanently enjoining Defendants from using Gateway's trade secrets; (b) entering judgment for the actual damages Gateway has suffered as a result of the misappropriation of its trade secrets which actual damages are not less than $9.8 million; (c) enter judgment against Defendants for the unjust enrichment in an amount not less than $9.8 million; (d) imposing a reasonable royalty on all past and present sales of 100 ga BON hybrid PBOM bag that have occurred; (e) award exemplary damages in an amount that is two (2) times the amount of damages awarded to Gateway; and (f) award Gateway its attorney's costs and fees and all other relief to which it is legally and lawfully entitled.

## Count II
### Tortious Interference with a Business Expectancy or Relationship
### (Morris Packaging, Morris Converting, Below, and Fiore)

157. Gateway hereby incorporates each of the foregoing paragraphs as if fully set forth herein

158. Gateway had an on-going business relationship (and expectancy of continued business with Diamond). Indeed, in late November 2016, Diamond and Gateway entered into a raw materials agreement relating to Gateway's production of the 100 ga BON hybrid bag.

159. Below and Morris were aware of Gateway's business relationship with Diamond. Below (and later Morris through Below) were also aware of the raw materials agreement between Gateway and Diamond.

160. Below, Fiore, and Morris intentionally interfered with Gateway's business relationship with Diamond by inducing Below and Fiore to leave Gateway to work for Morris and to share Gateway's trade secrets and confidential and proprietary information such that Morris could take advantage of it and also take away Gateway's business relationship with Diamond.

161. There was no valid justification for Below's, Fiore's, and Morris' actions.

162. As a result of these actions Gateway lost the benefit of the monies and time it had invested in developing the 100 ga BON hybrid bag. These developmental costs were at least $2 million. Gateway also lost at least $7.8 million in annual sales of the bag.

WHEREFORE, Gateway requests that this Court enter judgment in favor of Gateway and against Defendants (a) permanently enjoining Defendants from using Gateway's trade secrets; (b) entering judgment for the actual damages Gateway has suffered as a result of the misappropriation of its trade secrets which actual damages are not less than $9.8 million; (c) enter judgment against Defendants for the unjust enrichment in an amount not less than $9.8 million; (d) imposing a reasonable royalty on all past and present sales of 100 ga BON hybrid PBOM bag that have occurred; (e) award exemplary damages in an amount that is two (2) times the amount of damages awarded to Gateway; and (f) award Gateway its attorney's costs and fees and all other relief to which it is legally and lawfully entitled.

163.     Gateway hereby incorporates each of the foregoing paragraphs as if fully set forth

herein

164.     By expending significant time and money developing the 100 ga BON hybrid

bag, Gateway developed a product that had previously not existed in the marketplace.

165.     The bag was of great value to Diamond as it ensured that Diamond would be able

to continue selling pet food to Costco.

166.     As detailed above, Defendants jointly worked together to wrongfully obtain and

make use of Gateway's trade secrets.

167.     Defendants have been unjustly enriched by their misappropriation of Gateway's

trade secrets and proprietary information.

168.     As a result of these actions Gateway lost the benefit of the monies and time it had

invested in developing the 100 ga BON hybrid bag.  These developmental costs were at least $2

million.  Gateway also lost at least $7.8 million in annual sales of the bag.

WHEREFORE, Gateway requests that this Court enter judgment in favor of Gateway and

against Defendants (a) permanently enjoining Defendants from using Gateway's trade secrets;

(b) entering judgment for the actual damages Gateway has suffered as a result of the

misappropriation of its trade secrets which actual damages are not less than $9.8 million; (c)

enter judgment against Defendants for the unjust enrichment in an amount not less than $9.8

million; (d) imposing a reasonable royalty on all past and present sales of 100 ga BON hybrid

PBOM bag that have occurred; (e) award exemplary damages in an amount that is two (2) times

the amount of damages awarded to Gateway; and (f) award Gateway its attorney's costs and fees and all other relief to which it is legally and lawfully entitled.

## Count IV
## Civil Conspiracy
## (All Defendants)

169.    Gateway hereby incorporates each of the foregoing paragraphs as if fully set forth herein

170.    In approximately the latter half of 2016 and continuing into 2017, Defendants unlawfully conspired with one another to misappropriate Gateway's trade secrets.

171.    Both Diamond and Morris knew that that Below and Fiore possessed critical information regarding Gateway's trade secrets.  They also knew that Morris lacked sufficient knowledge to viably produce a 100 ga BON hybrid bag to be used for Costco.

172.    Accordingly, Defendants conspired to induce Below and Fiore to leave their employment at Gateway and start employment at Morris where they improperly divulged Gateway's trade secrets to Diamond and Morris which, in turn, were used to assist Morris in very quickly developing a 100 ga BON hybrid bag.

173.    Defendants acted willfully and maliciously in conspiring to misappropriate Gateway's trade secrets for their own personal gain.

174.    As a result of these actions Gateway lost the benefit of the monies and time it had invested in developing the 100 ga BON hybrid bag.  These developmental costs were at least $2 million.  Gateway also lost at least $7.8 million in annual sales of the bag.

WHEREFORE, Gateway requests that this Court enter judgment in favor of Gateway and against Defendants (a) permanently enjoining Defendants from using Gateway's trade secrets; (b) entering judgment for the actual damages Gateway has suffered as a result of the

misappropriation of its trade secrets which actual damages are not less than $9.8 million; (c) enter judgment against Defendants for the unjust enrichment in an amount not less than $9.8 million; (d) imposing a reasonable royalty on all past and present sales of 100 ga BON hybrid PBOM bag that have occurred; (e) award exemplary damages in an amount that is two (2) times the amount of damages awarded to Gateway; and (f) award Gateway its attorney's costs and fees and all other relief to which it is legally and lawfully entitled.

## Count V
### Breach of Contract
### (Greg Below)

175.    Gateway hereby incorporates each of the foregoing paragraphs as if fully set forth herein

176.    In connection with his Gateway employment, on September 11, 2012, Below signed a Non-Disclosure/Confidentiality Agreement with Gateway.  That Confidentiality Agreement provides in relevant part:

> As an employee of, or a consultant for, Gateway Packaging Company, I hereby covenant and agree that any and all knowledge or information which I may acquire or obtain therein, and particularly any knowledge or information or trade secrets which I may acquire with reference to Gateway's customers, suppliers and personnel, or the manufacturing, purchasing, pricing, costs and sales of any of Gateway's products (brokered or manufactured) *shall and will be held by me in strict confidence and trust. Further, I will not duplicate, discuss, disclose, divulge, reveal or in any way make known any such knowledge and/or trade secret information or any part thereof directly or indirectly to any other person, firm, corporation, or entity; or make any use of the same for myself or any other person, firm, corporation, or entity.*
> ....
> Should I leave the employment of Gateway Packaging Company for any reason, I understand that my obligation arising hereunder shall *continue for a period of two (2) years from the date thereof.*

(emphasis added).

177.     Below agreed through his Confidentiality Agreement to hold in strict confidence the confidential information and trade secrets he learned while employed at Gateway.  This Confidentiality Agreement extended for two years following the end of his employment.

178.     While employed at Gateway and while serving as the account manager for Diamond, Below learned highly detailed and sensitive trade secrets and other confidential and proprietary information regarding the production of the 100 ga BON hybrid bag.

179.     Below's Non-Disclosure/Confidentiality Agreement prohibited him from disclosing this sensitive information to unauthorized parties, including parties outside of Gateway.

180.     Upon information and belief and pleading in the alternative, Below breached his Non-Disclosure/Confidentiality Agreement while employed at Gateway by divulging too much information to Diamond and by not taking sufficient means to safeguard Gateway's proprietary and trade secret information.  This included, but is not necessarily limited to, Below's transmittal of the technical data sheet to Diamond as well as his numerous discussions with Diamond regarding the production of the 100 ga BON hybrid bag.

181.     Immediately after ending his employment with Gateway Below began working for Morris.  Shortly thereafter Morris began working with Diamond to develop a 100 ga BON hybrid bag for Costco.

182.     Morris could not have so quickly engineered and produced this bag without the aid of Below and the trade secrets and confidential and proprietary information that he learned while at Gateway.

183.     Below has continued breaching his Confidentiality Agreement by continuing to use the trade secrets and other proprietary and confidential information that he learned at Gateway in the course of his new employment at Morris.

184.     Gateway has been damaged as a result of Below's breach of his Non-Disclosure/Confidentiality Agreement. Specifically, as a result of these actions Gateway lost the benefit of the monies and time it had invested in developing the 100 ga BON hybrid bag. These developmental costs were at least $2 million. Gateway also lost at least $7.8 million in annual sales of the bag.

WHEREFORE, Gateway requests that this Court enter judgment in favor of Gateway and against Below (a) permanently enjoining Below from using Gateway's trade secrets; (b) entering judgment for the actual damages Gateway has suffered as a result of Below's breach of his Non-Disclosure/Confidentiality Agreement which actual damages are not less than $9.8 million; and (c) award Gateway its attorney's costs and fees and all other relief to which it is legally and lawfully entitled.

**Count VI**
**Breach of Contract**
**(Joseph Fiore)**

185.     Gateway hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

186.     On April 26, 2013, Fiore signed a written confirmation of offer of employment as Vice President of Sales and Marketing for Gateway based in its corporate office in St. Louis, Missouri.

187.     Fiore's written confirmation of employment contained the following provision by which Fiore agreed to be bound: "**Confidentiality:** You are expected to conduct yourself in a

manner consistent with the Gateway standard of conduct policy, the Gateway IT policy *and the Gateway Confidentiality Agreement*." (emphasis added)

188.    In connection with his new employment at Gateway Fiore signed a Confidentiality Agreement with Gateway.  Fiore's Confidentiality Agreement provides in relevant part:

1.      *Employee agrees that all information* and know-how, whether or not in writing, of a private, secret or confidential nature *concerning the business or financial affairs of the Company or the Company's affiliates is and shall be the exclusive property of the Company and the Company's affiliates*. Such information and know-how shall include, but not be limited to, trade secrets, ideas, skills, knowledge, improvements, works of authorship, inventions (whether or not patentable), products, processes, methods, techniques, formulas, compositions, projects, developments, plans, research data, financial data, personnel data, technical, business, financial, customer and product development plans and forecasts, customer pricing and tiered pricing schemes, computer programs, computer codes, algorithms, modules, scripts, features, and modes of operation, designs, technology, internal documentation and employee, customer and supplier lists, contacts at or knowledge of current or prospective customers of the Company or the Company's affiliates, and such other information concerning the Company or the Company's affiliates (collectively, "Proprietary Information"). *Employee shall not disclose*, either during the period of Employee's evaluation of the Company or thereafter, *any Proprietary Information to others outside the Company or the Company's affiliates or use the same for any unauthorized purposes without the prior written approval of the Company*.

2.      *Employee agrees that all* files, letters, memoranda, reports, records, data, sketches, drawings, laboratory notebooks, program listings, computer software, computer discs, tapes, printouts, source, html and other code, flowcharts, schematics, designs, photographs, charts and customer lists, or other written, photographic, or other tangible material, whether printed, typewritten, handwritten, electronically stored on disk, tapes, hard drives or other storage media, containing or embodying Proprietary Information or any other information concerning the business, operation or plans of the Company or the Company's affiliates, whether created by Employee or others, which shall come into Employee's custody, possession or control (collectively, *"Company Materials"), shall be and are the exclusive property of the Company or the Company's affiliates to be used by Employee only for the benefit of the Company or the Company's affiliates*. Employee understands that the Company possesses Company Materials that are important to the Company, the Company's affiliates and the customers and employees of the Company and the Company's affiliates and Employee agrees to deliver to the Company upon termination of the

evaluation (or prior thereto if so requested by the Company) all Company Materials in Employee's possession, custody or control.

3.    *Employee agrees that Employee's obligation not to disclose or use information, know-how and records of the types set forth in Sections 1 and 2 hereof, also extends to such types of information, know-how, records and tangible property of customers of the Company or the Company's affiliates or suppliers to the Company or the Company's affiliates or other third parties who may have disclosed or entrusted the same to the Company or the Company's affiliates or to Employee in the course of the Company's business.*

Confidentiality Agreement (emphasis added).

189.    Through his Confidentiality Agreement Fiore explicitly agreed to hold in strict confidence the confidential information and trade secrets he learned while employed at Gateway

190.    While employed at Gateway and while serving as its Vice President of Sales and Marketing, Fiore learned highly detailed trade secrets and confidential information regarding the production of the 100 ga BON hybrid bag.   Fiore also learned proprietary information of Gateway regarding its customers, Gateway's business practices, its sales, etc.

191.    Fiore's Confidentiality Agreement prohibited him from disclosing this information to unauthorized parties, including parties outside of Gateway.

192.    Upon information and belief, Fiore breached his Confidentiality Agreement by divulging to Morris and/or Diamond Gateway's trade secrets relating to the 100 ga BON hybrid bag as well as Gateway's business dealings with Diamond.

193.    Immediately after ending his employment with Gateway Fiore began working for Morris.  Within weeks Morris began working with Diamond to develop a 100 ga BON hybrid film for Costco.

194.    Morris could not have so quickly engineered and produced this film without the aid of Fiore and the trade secrets and confidential and proprietary information that he learned while at Gateway.

195.     Fiore has continued breaching his Confidentiality Agreement by continuing to use the trade secrets and other proprietary and confidential information that he learned at Gateway in the course of his new employment at Morris.

196.     Gateway has been damaged as a result of Fiore's breach of his Confidentiality Agreement.  Specifically, as a result of these actions Gateway lost the benefit of the monies and time it had invested in developing the 100 ga BON hybrid bag.  These developmental costs were at least $2 million.  Gateway also lost at least $7.8 million in annual sales of the bag.

WHEREFORE, Gateway requests that this Court enter judgment in favor of Gateway and against Below (a) permanently enjoining Fiore from using Gateway's trade secrets; (b) entering judgment for the actual damages Gateway has suffered as a result of Fiore's breach of his Confidentiality Agreement which actual damages are not less than $9.8 million; and (c) award Gateway its attorney's costs and fees and all other relief to which it is legally and lawfully entitled.

## Count VII
## Breach of Duty of Loyalty
### (Greg Below)

197.     Gateway hereby incorporates each of the foregoing paragraphs as if fully set forth herein

198.     As an employee of Gateway Below had a duty of loyalty and could not act in a manner inconsistent with Gateway's interests.

199.     In late 2016, Below was aware that his immediate supervisor, Fiore, would be leaving Gateway to work for Morris.  Below was also aware that he possessed critical and proprietary Gateway information that would be extremely valuable to Morris.

200.    At some point during his employment Below intentionally deleted his emails sent to Diamond regarding the non-disclosure agreement he had previously sent to Diamond.

201.    In late November 2016, Below disclosed a technical data sheet to Diamond with important trade secret information regarding Gateway's 100 ga BON hybrid bag.

202.    Below also possessed additional trade secrets regarding the construction of the 100 ga BON hybrid bag.

203.    During this time period Below was induced to leave his employment at Gateway and begin working at Morris.

204.    In recognition that he would be soon leaving Gateway, Below knowingly and intentionally took actions that were inconsistent with and contrary to the interests of Gateway.

205.    Below breached his duty of loyalty to Gateway.

206.    As a result of these actions Gateway lost the benefit of the monies and time it had invested in developing the 100 ga BON hybrid bag.  These developmental costs were at least $2 million.  Gateway also lost at least $7.8 million in annual sales of the bag.

WHEREFORE, Gateway requests that this Court enter judgment in favor of Gateway and against Below (a) permanently enjoining Below from using Gateway's trade secrets; (b) entering judgment for the actual damages Gateway has suffered which actual damages are not less than $9.8 million; and (c) award Gateway any attorney's costs and fees and all other relief to which it is legally and lawfully entitled.

## Count VIII
## Breach of Fiduciary Duty
### (Joseph Fiore)

207.    Gateway hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

208.    While employed by Gateway Fiore served as its Vice President of Sales and Marketing.  Fiore also owned units of Gateway's parent company.

209.    As an officer of Gateway and as an indirect owner in Gateway, Fiore had fiduciary obligations to protect Gateway's interests.  These obligations included, but were not limited to, not seeking to induce any employee of Gateway to leave the company and work for a competitor and not using any proprietary or trade secret information of Gateway that Fiore had learned or had access to, for the benefit of a competitor.

210.    Fiore breached his fiduciary obligation by inducing Below to leave Gateway to work for its competitor and using information Fiore had learned to induce Diamond to terminate its business relationship with Gateway in favor of Morris.

211.    Fiore breached his fiduciary obligations owed to Gateway.

212.    Gateway has been damaged as a result of Fiore's breach of his fiduciary obligations.  Specifically, as a result of these actions Gateway lost the benefit of the monies and time it had invested in developing the 100 ga BON hybrid bag.  These developmental costs were at least $2 million.  Gateway also lost at least $7.8 million in annual sales of the bag.

WHEREFORE, Gateway requests that this Court enter judgment in favor of Gateway and against Fiore (a) permanently enjoining Fiore from using Gateway's trade secrets; (b) entering judgment for the actual damages Gateway has suffered as a result of Fiore's breach of his fiduciary obligations which actual damages are not less than $9.8 million; and (c) award Gateway its attorney's costs and fees and all other relief to which it is legally and lawfully entitled.

**Demand for Jury Trial**

213.    Gateway hereby demands that this matter be tried to a jury.


                                    HUSCH BLACKWELL LLP

                                    /s/ Michael D. Fielding
                                    Michael D. Fielding MO 53124
                                    4801 Main Street, Suite 1000
                                    Kansas City, MO 64112
                                    Telephone:    (816) 983-8000
                                    Facsimile:    (816) 983-8080
                                    michael.fielding@huschblackwell.com

                                    Randall S. Thompson MO 45581
                                    190 Carondelet Plaza, Suite 600
                                    St. Louis, MO 63105
                                    Telephone:    (314) 480-1500
                                    Facsimile:    (314) 480-1505
                                    randall.thompson@huschblackwell.com
                                    *Attorneys for Plaintiff Gateway Packaging*
                                    *Company LLC*